IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 02-cv-001957-PSF-OES

JOHN M. LONGO,

      Plaintiff,

v.

REGIS JESUIT HIGH SCHOOL CORPORATION d/b/a REGIS JESUIT HIGH SCHOOL,

      Defendant.

─────────────────────────────────────────────────────────────

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
─────────────────────────────────────────────────────────────

      This matter comes before the Court on defendant's Motion for Summary Judgment (Dkt. # 66), filed May 4, 2005.  Defendant's motion is accompanied by a memorandum brief and exhibits numbered A-1 through A-25 (Dkt. # 67) ("Defendant's Motion").  Plaintiff filed his response in opposition to the motion on June 7, 2005, together with exhibits numbered 1 through 20 (Dkt. # 72) ("Plaintiff's Response").  On July 1, 2005, defendant filed a reply brief in support of its motion, together with exhibits A-26 through A-28 (Dkt # 75) ("Defendant's Reply").  On November 30, 2005, the parties submitted, and the Magistrate Judge approved, a Final Pretrial Order.  On the same day the case was set for a nine-day trial to a jury commencing March 27, 2006.  This matter is ripe for determination.

## BACKGROUND

      Plaintiff John M. Longo was employed as a theology teacher at Defendant Regis Jesuit High School commencing August 1999, and was employed pursuant to one year

contracts until at least the school year commencing in Fall 2000.  According to plaintiff, on or about February 21, 2001 defendant informed plaintiff that it would not be renewing his contract for the following academic year (Complaint, ¶ 28).  In its motion, defendant asserts that plaintiff was notified his contract would not be renewed by letter dated April 18, 2001 (Defendant's Motion at 24).  A copy of a notification letter dated April 18, 2001 is attached as Exhibit A-20 to defendant's motion.  In his response plaintiff admits the defendant's assertion that he was notified on April 18, 2001 (Plaintiff's Response at 5). For the purposes of this Order, the exact date of the nonrenewal notice is not determinative.

On or about June 30, 2001, plaintiff filed a discrimination charge with the Colorado Civil Rights Division ("CCRD") (Exhibit A-24 to Defendant's Motion).  The form charge lists the dates of discrimination as occurring between August 21, 2000 and February 21, 2001. Where the form provides boxes for the employee to check off the basis for discrimination, plaintiff indicated "disability" and "retaliation."  In the space provided for the description of personal harm, plaintiff stated:  "That on or about February 21, 2001, prior to and continuing, the above-named Respondent, by or through it agents/employees, discharged me from my Theology Teacher position, for which I was otherwise qualified, in unlawful retaliation for my engaging in a protected civil rights activity, of which the Respondent had prior notice."  (*Id.*)

The form also contains plaintiff's narrative statement that he believed he was "unlawfully discriminated against because: 1) Throughout my employment I was satisfactorily performing my job; 2) I was denied accommodation and; 2) [sic] denied

2

training [to] enable me to get a pay increase thus; 3) my contract was not renewed;
4) I feel I was retaliated against by not being allowed to return to teaching because my
wife and I had twins." (*Id*.).

On December 10, 2001, plaintiff, through counsel, submitted supplementary
materials to the CCRD in support of his claim, including an affidavit by plaintiff (*see*
Exhibit 13 to Plaintiff's Response).  On July 18, 2002, apparently after conciliation efforts
were unsuccessful, the CCRD issued a determination and notice of right to sue, which
discusses at some length the parties' respective positions (Exhibit A-25 to Defendant's
Motion)

On October 15, 2002, plaintiff filed his complaint in this case, alleging in one
unnumbered count that defendant engaged in a continuing course of unlawful employment
practices in violation of the Americans with Disabilities Act ("ADA"), particularly 42 U.S.C.
§§ 12112 and 12203.  Complaint, ¶ 38.  Plaintiff avers that he is a qualified individual with
a disability due to complete blindness, hearing loss in one of his ears, phlebitis, and
diabetes, which impairments affect his major life activities.  Complaint, ¶¶ 12, 13.  The
complaint alleges that the unlawful employment practices included "limiting, segregating,
or classifying an employee in a way that adversely affects the opportunities or status of
such employee because of disability of the employee."  Complaint, ¶ 38.  The complaint
further claims that defendant discriminated against plaintiff because of his disability, in
regard to advancement and discharge, in not making reasonable accommodations, in
denying employment opportunities, and using selection criteria to "screen out an
individual with a disability."  *Id.*  In separate paragraphs the complaint alleges that

3

defendant created an intimidating, hostile and abusive environment due to plaintiff's disability, and retaliated against plaintiff for "opposing practices made unlawful by the ADA." Complaint, ¶¶ 39, 40.        On November 19, 2002, while this case was pending before Chief Judge Babcock, defendant filed a motion to dismiss plaintiff's complaint pursuant to Rule 12, F.R.Civ.P., arguing that plaintiff's ADA claims are barred by the First Amendment and the "ministerial exception" to the ADA.  In an order entered September 22, 2003, Chief Judge Babcock denied defendant's motion.  Chief Judge Babcock considered matters outside the pleadings and converted defendant's motion into a motion for summary judgment (Order at 2).  Distinguishing this case on its facts from his prior decision in *Powell v. Stafford,* 859 F. Supp. 1343 (D. Colo. 1994), Chief Judge Babcock held that application of the ADA to plaintiff's claims is not barred by the Free Exercise Clause or the Establishment Clause of the First Amendment to the United States Constitution because it appeared that plaintiff, unlike Powell, taught theology from  "an academic or historical perspective" as opposed to a "ministerial, doctrinal or faith-based perspective."  (Order at 5).  In addition, Chief Judge Babcock found that plaintiff, unlike Powell, is not an ordained priest, had not attended a seminary, did not teach prayer as a component of his class, did not teach in the school's chapel, nor was it shown that plaintiff taught students in "Roman Catholic doctrine" as did Powell.  *Id.*  Thus, Judge Babcock found that there were genuine issues of material fact as to the nature of plaintiff's duties at the defendant school which precluded summary judgment.  *Id.* at 5-6.  The order by Chief Judge Babcock did not expressly refer to the "ministerial exception" and expressly stated

that it did not preclude future filing of a motion for summary judgment by defendant on the same issues. *Id.* at 7.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In its current motion for summary judgment defendant argues that summary judgment should now be entered on several distinct grounds.  Not surprisingly, defendant reasserts that plaintiff's ADA claims are barred by the First Amendment and the "ministerial exception" to the ADA (Defendant's Motion at 28-34).  Second, defendant asserts that even if the ADA applies, plaintiff did not exhaust his administrative remedies by including in his EEOC charge all of the claims asserted in the complaint (Defendant's Motion at 49-52).  Defendant further argues that plaintiff cannot establish a *prima facie* case of retaliation in violation of the ADA (Defendant's Motion at 40-44).  Defendant also contends that plaintiff has not established a *prima facie* case of wrongful discharge under the ADA (Defendant's Motion at 34-40), and even if he could, defendant has come forward with legitimate, nondiscriminatory reasons for not renewing plaintiff's contract (Defendant's Motion at 45-49).

## STANDARD OF REVIEW

Defendant's present motion is now expressly presented as a motion under Rule 56 seeking summary judgment on all claims.  The purpose of a summary judgment motion is to assess whether a trial is necessary.  *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir. 1995).  In other words, there "must be evidence on which the jury could reasonably find for the plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996).  A court grants summary judgment for the

moving party only where there is no genuine issue as to any material fact in the pleadings, depositions, answers to interrogatories, admissions, and affidavits.  F.R.Civ.P. 56(c). When applying this standard, a court must view the factual record in the light most favorable to the nonmovant.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

As defendant's motion sets forth various grounds as to the various claims asserted by plaintiff, this Order separately addresses the defendant's arguments.

## A.    Whether the First Amendment or the "Ministerial Exception" Bars Plaintiff's Claims

If defendant is correct that the ADA cannot be applied to defendant's employment decision with respect to plaintiff, then all of plaintiff's claims must be dismissed as they are all based on alleged violations of the ADA.  Because defendant has previously made this same argument before Chief Judge Babcock, and because he treated defendant's motion as one for summary judgment, his decision stands as the law of the case.  If defendant's current motion does not present any evidence that resolves the factual dispute identified by Chief Judge Babcock, or some additional argument of law, this Court is bound by the law of the case and defendant's motion on this ground must be denied.

Defendant asserts that the Establishment Clause of the First Amendment precludes courts from reviewing hiring and firing decisions of religious institutions because it would

involve impermissible entanglement with religious authority.  To be sure, there are decisions holding that application of one or another of the various employment discrimination statutes to a religious institution's employment decisions may invade the protections of the Establishment Clause, but those cases are distinguishable on their facts.

For example, if the employment decision emanated from application of religious doctrine, then courts tend to hold that such decisions cannot be challenged under the employment laws.  In *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), the Tenth Circuit precluded application of Title VII to the wrongful termination and sexual harassment claims of a female youth minister who was openly gay. Describing its ruling as application of the "church autonomy" doctrine, the circuit panel ruled that such doctrine "prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance and polity."  289 F.3d at 655.  The opinion pointed out, however, that the doctrine "does not apply to purely secular decisions, even when made by churches."  *Id.* at 657.  The Court stated that employment decisions of churches may be subject to Title VII scrutiny, "where the decision does not involve the church's spiritual functions."  *Id.*  In *Bryce*, the court ultimately held that Title VII could not be applied to the treatment of Plaintiff Bryce as her continued employment given her sexual preference was a matter of internal church governance and doctrine, relating as it did to ecclesiastical discussion of church policy.   *Id.* at 658.

In the instant case, the defendant does not claim that its decision to not renew plaintiff's contract related to church governance or doctrine.  Rather, the reasons given by

defendant, which plaintiff challenges as pretextual, relate to plaintiff's performance as a teacher.  Moreover, they relate to his performance as a teacher quite apart from the theological subject matter he taught.  Defendant asserts that plaintiff's contract was not renewed because he "was not able to conduct classes at an appropriate level for the students he was teaching," and because "[t]he material was too advanced, his teaching style was lecture driven, his language was abstract, the goals of the class were unclear, and the students were left confused and frustrated."  (Defendant's Motion at 47).  Moreover, the school assistant principal, Susan Resnick, testified that she provided a contemporaneous memorandum to the school's president, Father Walter Sidney (*see* Resnick Depo., Exhibit A-15 to Defendant's Motion, at 141), listing the following reasons for plaintiff's non-renewal:

> "The level of instructions does not meet the needs of the learners."

> "The students are not appraised of their grades."

> "Class does not have a clear beginning or ending."

> "He continues to write on the blackboard when he has been told the students can not read his writing."

> "Frequently misses school communications."

Exhibit A-21 to Defendant's Motion.

None of the stated reasons for plaintiff's nonrenewal implicate internal church governance or doctrine, or relate to ecclesiastical discussion of church policy, as was the case in *Bryce*.  Defendant does not suggest that it determined not to rehire plaintiff because of any motive unique or even principally germane to a religious institution.  Rather, because defendant intends to show that plaintiff was not renewed for legitimate,

nondiscriminatory reasons other than his alleged disability, the inquiry will not present a significant risk that the First Amendment will be infringed.  *See N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 502 (1979)*; Grotke v. Canisius High School of Buffalo, New York,* 1992 WL 535400 at *2 (W.D.N.Y. 1992).  Thus, this Court cannot find that application of the ADA to defendant's employment decision with respect to plaintiff would necessitate an impermissible entanglement with religious doctrine prohibited by the First Amendment.

Defendant also argues that whatever the reason for plaintiff's nonrenewal, the decision of a religious entity regarding the appointment and removal of a minister or other person in a position of similar theological significance is "beyond the ken of civil courts." (Defendant's Motion at 29). To be sure, there are numerous cases that prohibit application of the employment discrimination laws to a religious institution's selection of clergy and others discharging principally spiritual oriented duties.  As Chief Judge Babcock stated in *Powell*, "[c]ourts have consistently held that the ADEA does not apply in cases involving employees performing primarily religious functions. [Citations omitted] . . .  The First Amendment precludes judicial resolution of employment decisions involving ministerial employees."  859 F. Supp at 1346.  As aptly noted in *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167-68 (4th Cir. 1985), *cert. denied,* 478 U.S. 1020 (1986),  "[t]he right to choose ministers without government restriction underlies the well-being of religious community [citation omitted], for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its

message, and interpret its doctrines both to its own membership and to the world at large."
(Footnote omitted).

Moreover, there are cases, like *Powell*, that have applied the "ministerial exception"
to teachers even though the are not technically ministers.  But as noted by Chief Judge
Babcock, these cases apply the exception only where the employee's primary duties
consist of religious teaching, spreading the faith, church governance, supervision of a
religious order, or supervision or participation in religious ritual and worship.  *See* 859
F. Supp. at 1347 and cases cited.  As stated in *Musante v. Notre Dame of Easton Church*,
2004 WL 721774 (D. Conn., March 30, 2004), a case cited by defendant, "in determining
whether the ministerial exception applies, the courts must look to the nature of the
position and not simply the employee's title."  2004 WL 721774 at * 5.  For purposes of
determining its threshold jurisdiction, as the court did in *Musante*, this Court "must
undertake a fact-specific inquiry," here taking all of plaintiff's assertions as true, to
determine whether his duties at Regis can be said to be important to the spiritual and
pastoral mission of the school.  *Id.*

The question presented here is thus whether the plaintiff's specific duties as a
theology teacher at defendant high school meet the definition of ministerial activity.  Chief
Judge Babcock found that the matter was in dispute and denied summary judgment at that
time, but the Court will consider whether the present record resolves the dispute.

Defendant here argues that plaintiff is a ministerial employee because it is
undisputed that Regis is a Catholic High School controlled by the Society of Jesus
(Jesuits), it is designated as a Religious Institute by the Archdiocese of Denver, that the

10

principles of the school establish it as a Christian, Jesuit school, and that one of plaintiff's former students, commented in a letter that plaintiff "faithfully and passionately" taught Catholic Theology (Defendant's Motion at 30).   While these arguments may further the point that Regis High School is a religious institution (an issue on which Chief Judge Babcock found no real dispute, although plaintiff apparently does not yet concede it, *see* Plaintiff's Response at 41, n.5), they nonetheless offer precious little by way of admissible evidence as to the duties actually performed by plaintiff in his position as a theology teacher at the school.

By contrast, plaintiff asserts by way of affidavit that he was not employed by the Archdiocese, but rather by the high school itself, which he claims is an independent school with its own Board of Trustees.  Longo Affidavit, Exhibit 6 to Plaintiff's Response at ¶¶ 3, 5.  He further attests that he was never asked to conform to any curriculum approved by the Archdiocese, nor did the Archdiocese directly or indirectly control or guide what or how he was to teach.  *Id.* at ¶ 7. He states the school itself did not control or guide the subject matter which he taught.  *Id.*  He further avers that the school did not teach from the Roman Catholic Catechism, did not necessarily use textbooks which had a "Catholic *imprimatur*" or a "*nihil obstat*," a certification of absence of conflict with official Catholic Doctrine.  *Id.* at ¶ 8.   He also asserts that he taught theology from an academic perspective, not a ministerial, doctrinal or faith-based perspective.  *Id.* at ¶ 9.  He claims moreover that he did not teach ecclesiastical doctrine, worship-related subjects, the Christ of faith, or any pastoral subjects.  *Id.* at ¶ 10.  Plaintiff's affidavit goes on to claim that he had no pastoral duties, such as conducting worship services, counseling, or performing

evangelical or outreach work. *Id.* at ¶ 12. Although he attended services with students as he was required to do, he never had a leadership or supervisory role. *Id.* Finally, he avers that he had no pastoral background or education. *Id.* at ¶ 13.

In reply defendant argues, through the deposition testimony of Sister Pat Dunphy, director of the theology department, that plaintiff taught "the theology class of Christology" (Defendant's Reply at 5). It is true that she testified that she once observed plaintiff teaching a "Christology" class, but the testimony itself offers no description or explanation of what or how the subject was taught. *See* Dunphy Depo., Exhibit A-26 to Defendant's Reply, at 44-45. Moreover, even a fifth grade elementary school teacher plaintiff who taught some religious courses in a Catholic school along with her secular classes, organized the Mass once a month, and perceived one of her duties to be an "example of Christianity," was found not to precluded by the ministerial exception from protection under the ADEA. *See Guinan v. Roman Catholic Archdiocese of Indianapolis,* 42 F. Supp. 2d 849, 850-52 (S.D. Ind. 1998).

Furthermore, the Court finds no documents in the record setting forth a job description for plaintiff's position as a theology teacher, or even a curriculum provided by the school as to the subject matter he is supposed to teach, making it difficult to assess exactly what plaintiff was expected or required to teach. In assessing whether an employment dispute implicates doctrinal issues, a court should examine the circumstances surrounding creation of the employment relationship to ascertain whether those circumstances indicate that the parties intended that control of the teaching position would depend on doctrinal matters. *See Welter v. Seton Hall University*, 128 N.J. 279,

608 A.2d 206, 215 (N.J. 1992).  The only document the Court has located that describes plaintiff's position is an employment contract dated March 1, 2000, which merely states his duties to be providing "instruction in assigned classes in a professional manner." (Exhibit A-3 to Defendant's Motion).  While that contract term is qualified to require that plaintiff's duties "shall be carried out . . . in a manner supportive of the educational principles, policies and objectives of the school," it fails to resolve whether plaintiff was expected or required to teach religious doctrine.

On this state of the record, viewing the evidence as it must in a light most favorable to the non-moving party, it cannot be said that there are no disputed material facts that show that plaintiff's duties were "exclusively religious" as in the *Powell* case, or even primarily religious in that they consisted of spreading the faith, or supervising or participating in religious ritual or worship.  Accordingly, the Court DENIES defendant's motion for summary judgment as the disputed facts do not show that the First Amendment or the ministerial exception preclude application of the ADA in this case.

However, the Court agrees with defendant that the ultimate question of whether or not plaintiff is protected by the ADA is a threshold jurisdictional question of law that this Court, rather than a jury, must decide (Defendant's Reply at 6).  In *Musante*, the case cited by defendant, the court stated that factual disputes between the parties regarding the plaintiff's duties could not be resolved without holding an evidentiary hearing.  2004 WL 721774 at *2.  But, because the court there accepted all of plaintiff's allegations to be true, and yet found against her, it obviated the need for such a hearing.  Here, a pretrial evidentiary hearing may be appropriate to resolve the factual disputes regarding the

13

plaintiff's job duties and the application, if any, of the ministerial exception, or such issues

may best be decided by the Court at trial.

**B.      Whether Plaintiff's CCRD Charge Preserved Claims Other Than Retaliation**

In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional

prerequisite to filing suit under Title VII.  Title 42 U.S.C. § 12117(a) provides that the same

procedures found in Title VII, including those of 42 U.S.C. § 2000e-5, apply to disability

discrimination claims.  In *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1105 (10th

Cir. 2002), the Court expressly held that exhaustion of administrative remedies under the

ADA, 42 U.S.C. § 12101 to § 12213, is a jurisdictional prerequisite to suit in the Tenth

Circuit.

To exhaust administrative remedies, a Title VII plaintiff generally must present his

claims to the EEOC as part of a timely filed EEOC "charge" for which he has received a

right-to-sue letter.  *Welsh v. City of Shawnee*, 1999 WL 345597 at *2 (10th Cir., June 1,

1999).  As succinctly explained in the *Welsh* decision:

> [t]he charge "shall be in writing and signed and shall be
> verified," 29 C.F.R. § 1601.9, and must at a minimum
> identify the parties and "describe generally the action or
> practices complained of," *id.* § 1601.12(b).  The charge
> tells the EEOC what to investigate, provides it with the
> opportunity to conciliate the claim, and gives the charged
> party notice of the alleged violation.

While plaintiff in this case did file a formal charge of discrimination within the time

permitted by the ADA, defendant argues that the filed charge describes only a claim of

discrimination based on "alleged ***retaliation*** for requesting reasonable accommodations

for his blindness."  (Defendant's Motion at 50; emphasis in original).  Because plaintiff's

14

complaint in this case includes claims for what this Court will describe as substantive violations of the ADA by way of denial of reasonable accommodations (Complaint, ¶ 38) as well as claims for hostile work environment (Complaint, ¶ 39), and retaliation for opposing practices made unlawful by the ADA (Complaint, ¶ 40), defendant asserts that plaintiff failed to exhaust his administrative remedies as to claims other than retaliation based on his blindness, and therefore all other claims contained in the complaint should be dismissed.

As indicated above, on his CCRD charge of June 30, 2001 plaintiff checked off two basis of discrimination: "retaliation" and "disability." (Exhibit A-24 to Defendant's Motion). The ADA prohibition against retaliation is found in 42 U.S.C. § 12203(a), which makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." This statutory protection would apply to anyone, disabled or not, who engages in the protected activity described in the statute. *See Selenke v. Medical Imaging of Colorado, Inc.*, 248 F.3d 1249, 1264 (10th Cir. 2001) ("[I]n order to prosecute an ADA retaliation claim, a plaintiff need not show that she suffers from an actual disability. Instead, a reasonable, good faith belief that the statute has been violated suffices."). The statute outlawing discrimination against the disabled is 42 U.S.C. § 12112. This statute proscribes discrimination against a qualified individual with a disability. These two statutes proscribe quite different conduct.

A fair reading of plaintiff's CCRD charge is that he was complaining under both statutes.  That is, he was complaining of discrimination because he is disabled, and he was complaining of retaliation against him because he was engaged in the protected activity of requesting "reasonable accommodations."  Indeed, his narrative discrimination statement expressly states "I believe I was unlawfully discriminated against because . . . 2) I was denied accommodation and; 2) [sic] denied training . . . ." (Exhibit A-24 to Defendant's Motion).

As the Court stated in *Welsh*, the purpose of the charge is to provide notice to the employer of the charging party's complaints, and to give the EEOC or CCRD an opportunity to conduct conciliation with respect to the employee's complaints.  Both of these purposes were accomplished here with regard to both the substantive disability discrimination charge and the retaliation charge filed by plaintiff.  First, in response to plaintiff's charge, a letter from defendant's counsel dated October 12, 2001 states that the school "did not discriminate against Mr. Longo in any manner, nor did Regis discharge Mr. Longo in retaliation for his engaging in protected activity."  (Exhibit 11 to Plaintiff's Response at 1).  This is in response to what defendant perceived as plaintiff's contention "that he was somehow retaliated against for engaging in a protected civil rights activity *and as a result of his disability*, which he does not specify." (*Id.*; emphasis added).  Thus, the employer acknowledged plaintiff's charge as consisting of both a claim for discrimination, albeit in an unspecified manner, as well as retaliation.

Second, it appears from the record that the CCRD considered plaintiff's claim for denial of reasonable accommodation as well as his retaliation claim in the conciliation

16

process.  Even if the charge itself did not provide express notice and an opportunity to conciliate, plaintiff's later filed affidavit of December 2001 certainly indicates that he was complaining about both substantive discrimination due to not receiving reasonable accommodations, as well as retaliation.  *See* Exhibit 13 to Plaintiff's Opposition, Affidavit of John Longo.  Such supplement to the charge may be considered by the court as part of the charge in evaluating whether plaintiff exhausted administrative remedies, if it provides notice and an opportunity to conciliate.  *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1260 (10th Cir. 1998).

In his affidavit plaintiff asserted that he had requested from the school at least accommodation by way of computer adaptations or other software that could be used by the blind but none was provided (Affidavit at 2-4), accommodations to the system of posted notices so that plaintiff could be aware of same without having to read them but none was provided (Affidavit at 5-6), and accommodation by way of reading assistance (Affidavit at 6).  Some of these requests were certainly considered by the CCRD, and apparently made known to defendant.  In the final determination letter of July 18, 2002, the CCRD states that plaintiff "asserts that he was denied, as a reasonable accommodation, computer training . . . ," and that the charging party maintains that "had he been provided with the accommodations he had requested, he would have been able to fulfill some of the Respondent's expectations."  (Exhibit A-25 to Defendant's Motion, at 2, 7).  Based on this record, the Court finds that plaintiff sufficiently exhausted his administrative remedies with respect to his claims of denial of reasonable accommodations based on his blindness, and retaliation for requesting the same.

17

On the other hand, the Court finds that plaintiff **did not** exhaust his administrative remedies as to his claim of hostile work environment based on his disability, or his assertion that he was discriminated due to disability conditions other than blindness.

The Tenth Circuit has recognized that a claim for hostile work environment based on a plaintiff's disability is actionable under the ADA.  *See Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1155-56 (10th Cir. 2004).  The Court arrived at this holding by analogizing the protections of the ADA to the protections of Title VII.  Although *Lanman* did not state the elements of such a claim, by analogy to Title VII the claimant  would have to demonstrate that the employer permitted a work environment where the discriminatory conduct taken against a disabled plaintiff was so severe or pervasive that it altered the conditions of the victim's employment and created an abusive working environment.  *Cf. Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986) (describing level of proof for sexually hostile work environment)

This Court finds nothing in the CCRD charge that would put the defendant on notice that plaintiff was complaining about a hostile work environment due to his asserted disability that was so severe and pervasive that it altered the employment conditions and create an abusive environment.  There is also no indication that defendant responded to plaintiff's charge as if it alleged a hostile work environment. There is no indication that the CCRD engaged in conciliation regarding such conduct.

Moreover, while there is one sentence in plaintiff's December 2001 affidavit that references a hostile work environment (Affidavit at 7), the absence of any mention in the actual charge compels the conclusion that such claim does not relate back to the charged

filed on June 30, 2001.  *See Gunnell, supra*, 152 F.3d at 1260, n.3.  Thus, even if the affidavit alleges hostile work environment, it is only timely as to conduct that occurred within 300 days preceding the affidavit, that is after February 13, 2001.  *Id.*  Because the acts described in plaintiff's affidavit that could give rise to a hostile work environment occurred before that date, and with his non-renewal occurring, according to plaintiff on February 21, 2001, there is no conduct identified in the affidavit that would give rise to a hostile work environment with respect to which a timely charge was filed.

For these reasons the Court finds that plaintiff has failed to exhaust his administrative remedies as to the allegations in his complaint of hostile work environment due to disability, and that claim is dismissed.

Similarly, the Court finds nothing in plaintiff's CCRD charge that indicates he is claiming disability discrimination based on any particular condition, even blindness. However, his submission of December 10, 2001 certainly explains, as indicated above, that he is complaining about a failure to make accommodation for his blindness.  While the affidavit also mentions his conditions of phlebitis, hearing loss and diabetes (Affidavit at 1), it nowhere asserts a request for accommodations based on those conditions, much less a denial of same.  Accordingly, plaintiff has failed to exhaust his administrative remedies as to his allegations of disability discrimination due to any condition other than blindness.  To the extent the complaint alleges discrimination based on a disability other than blindness, those claims are dismissed.

**C.     Whether Plaintiff Has Established A *Prima Facie* Case of Retaliation in Violation of the ADA.**

In his complaint plaintiff alleges generally that defendant retaliated against him "for opposing practices made unlawful by the ADA."  Complaint, ¶ 40.  Elsewhere in his complaint, plaintiff alleges specifically that in October 2000 he made a request in writing for reasonable accommodations for his blindness, stating that defendant's refusal to provide the accommodations was affecting his job performance.  Complaint, ¶ 21.  Plaintiff avers that "[w]ithin hours" of making this request, defendant's principal  began to retaliate against him by threatening not to renew his contract, including presenting a critical performance memorandum dated October 24, 2000.  Complaint, ¶ 22; Exhibit A-13 to Defendant's Motion.

Plaintiff also alleges in his complaint that his wife provided him with job-related reading and other assistance, although she was not associated with or paid by the school. Complaint, ¶ 23.  In January 2001, when his wife was experiencing pregnancy difficulties, plaintiff made it known to the school that she would be unable to continue to provide the unpaid reading and other assistance, implying that the school would be asked to provide substitute services.  Complaint, ¶ 24.  Plaintiff alleges that on January 11, 2001, he notified the school that he would taking a one-week paternity leave, and shortly thereafter the school representatives began to harshly criticize his work performance.  Complaint, ¶¶ 25-26.  He also alleges that the school demanded that his wife continue to perform the job-related reading for him, despite her hospitalization, and at about the time he advised the school that she could not do so, the school notified him that it would not renew his contract.  Complaint, ¶¶ 27-28.

In its motion for summary judgment, defendant argues that plaintiff has not established a causal connection between the purported retaliatory action and the protected activity in which plaintiff engaged (Defendant's Motion at 40).  Defendant argues, essentially, that there is a lack of temporal connection between its decision not to renew his contract and any alleged protected conduct, and that any adverse action taken against him preceded, rather than followed, the alleged protected conduct.  (Defendant's Brief at 41-44).

The Court cannot agree that plaintiff has failed to show a sufficient connection between the adverse employment action alleged, and the protected conduct alleged, so as to permit the entry of summary judgment against him on his retaliation claim.  First, the retaliatory conduct alleged by plaintiff includes not only his nonrenewal in February or April of 2001, but also the alleged criticism of his performance that he claims followed on the heels of his request for accommodation.  Second, the time sequence as described in plaintiff's complaint, and as reasserted in his affidavit (contained within Exhibit 13 to Plaintiff's Response), supports an inference that the criticism of his teaching performance, which eventually led to the decision to not renew his contract, was retaliatory, as it followed closely enough to his express request for accommodations in October 2000, and his implicit request for further accommodations when his wife could no longer serve as his assistant.  Whether the criticism of his performance and his ultimate nonrenewal were justified, as defendant repeatedly argues, is a matter that remains to be determined.  But certainly the first mention of possible nonrenewal is found in the memorandum dated October 24, 2000 (Exhibit A-13), which followed closely plaintiff's written request for

accommodations, and the actual termination occurred in February or April 2001, shortly after he advised the school that his wife would no longer be able to provide the assistance he required.  Thus, on the present record, plaintiff at least has shown a temporal connection that satisfies the level of proof necessary to show a *prima facie* case of retaliation in violation of the ADA.

**D.      Whether Plaintiff Has Established a *Prima Facie* Case of Discrimination Based on Disability in Connection with His Nonrenewal.**

Plaintiff alleges that one of the several ways in which defendant violated the ADA was to discharge him from his position because of his disability.  Complaint, ¶ 38. Defendant appears to argue that it is entitled to summary judgment on this aspect of plaintiff's ADA claim.[1]  Defendant apparently does not dispute that plaintiff's blindness constitutes a protected disability, but nonetheless argues that he has failed to establish a *prima facie* case of discrimination based on disability in connection with his discharge.  If an individual has a protected disability, he may establish a *prima facie* case of discriminatory discharge under the ADA by demonstrating that: (1) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (2) his employer terminated his employment under circumstances giving rise to an inference that the action was based on his disability.  *Selenke, supra,* 248 F.3d at 1259. Defendant argues plaintiff has failed to demonstrate both of these elements.

1.      *Performance of essential functions of teacher position*

---

[1] Defendant apparently does not assert that it is entitled to summary judgment on plaintiff's claims that he was denied reasonable accommodations while employed, stating only that any such claims are not properly before this Court because, in part, plaintiff did not exhaust his administrative remedies (Defendant's Motion at 34, n.3).  As stated above, the Court does not totally agree with defendant.

Defendant first argues that plaintiff has not shown that he is qualified to perform the essential functions of the job of theology teacher because he has failed to teach the Regis High School students at an appropriate level (Defendant's Motion at 35).  This position, of course, is asserted by defendant as the reason for not renewing plaintiff's contract, but plaintiff asserts that the reason is pretextual.  In any event, the argument does not suffice to defeat plaintiff from showing that he can perform the essential functions of the position of teacher of theology.

As stated in *Matczak v. Frankford Candy and Chocolate Co.,*136 F.3d 933, 938 (3d Cir. 1997), satisfaction of an employer's expectations is not a requisite element of a *prima facie* employment discrimination case.  Rather, "objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality is better left to the later stage of the McDonnell Douglas analysis."  *Id.* (citation and ellipsis omitted).  As the Third Circuit explained, the rationale behind this position is that subjective evaluations are more susceptible to abuse and more likely to mask pretext.  Thus, reasons such as those advanced by defendant here are better examined at the pretext stage than at the *prima facie* stage.  *Id.* at 939; *See also Fitzpatrick v. National Mobile television,* 364 F. Supp. 2d 483, 489 (M.D. Pa. 2005) ("As [defendant employer] has presented no argument that Plaintiff was not objectively qualified and has argued only that Plaintiff has failed to meet the employer's subjective expectations, . . . Plaintiff has established the second element of the prima facie case.").

Moreover, the objective evidence of record seems to suggest that plaintiff was qualified to perform the essential functions of the position with or without reasonable accommodations. The undisputed evidence is that plaintiff was hired by defendant into the position of theology teacher in 1999. His contract was renewed in March 2000. Thus, on at least two occasions, defendant itself perceived plaintiff as objectively capable of filing the essential functions of the position.

Defendant offers a secondary argument that plaintiff fails to establish his *prima facie* case because while he alleges a failure by defendant to provide the requested accommodations, he also states that he could perform his job without such accommodations. Thus, defendant argues, if plaintiff could perform the duties without accommodation, "he <u>cannot</u> sustain his claim of a failure to provide accommodations." (Defendant's Motion at 36-37; emphasis in original). Defendant cites the case of *Aramburu v. Boeing Company,* 112 F.3d 1398, 1413 (10th Cir. 1997) in support of this proposition.

This Court finds that the argument is not persuasive as it appears to reflect a fundamental misunderstanding by the defendant of the scope of the ADA, nor is the citation to *Aramburu* apposite. As stated above, the plaintiff alleging a discriminatory discharge in violation of the ADA needs to show that he was qualified to do the job "with or without reasonable accommodation." As accurately summarized in *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996):

> The ADA prohibits discrimination against disabled individuals. 42 U.S.C. § 12112. The prohibition extends not only to denial of employment opportunities based on vocationally irrelevant disabilities, but extends to

24

> discrimination based on disabilities that impair the individual's ability to perform her job.  Thus the ADA defines discrimination as including an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer] . . . ."  42 U.S.C. § 12112(b)(5)(A).

(Citation omitted; brackets in original.)  This means that if the disabled plaintiff could do the job **without** reasonable accommodation, and yet he is discharged, the statute may be violated if the termination occurred under circumstances giving rise to an inference of discrimination.  Or, if the employee can do the job **with** reasonable accommodations, but the employer unreasonably refuses to provide such accommodations, the statute may be violated as well.  The fact that plaintiff here may be alleging both possible scenarios, that is he was discharged because of his disability despite being able to perform without accommodation, or he was denied reasonable accommodations that impeded his ability to perform, does not undermine his *prima facie* case.

Indeed, the decision in *Aramburu* did not address whether the plaintiff established a *prima facie* case of disability discrimination, but rather whether he had overcome the employer's asserted nondiscriminatory reason for his discharge.  *Aramburu*, *supra*, 112 F.3d at 1412 ("[W]e find that Aramburu failed to present evidence from which a reasonable jury could find that the proffered reason for his discharge, excessive absenteeism, was a pretext or that he was actually discharged because of his disability.").

2.    *Circumstances giving rise to an inference that the action was based on his disability.*

25

Defendant also asserts that plaintiff has failed to demonstrate the third prong of the *prima facie* case, namely that the employer terminated him under circumstances giving rise to an inference that the action was based on her disability.  Such an inference is usually supplied in employment discrimination cases by a simple showing that the discharged protected employee was replaced by an employee outside the protected class.  However, in cases under the ADA such a showing has been held to be not required of the discharged disabled employee.  *See Butler v. City of Prairie Village, Kansas,* 172 F.3d 736, 748 (10th Cir. 1999).  As explained in *Ennis v. National Association of Business and Educational Radio, Inc.*, 53 F.3d 55 (4th Cir. 1995), such a showing is not required because information as to whether the replacement employee is within or without the protected class may hard to obtain, and because it is likely that most replacements would fall within the broad scope of the ADA's protected class, because that class includes not only those who are disabled, but also those who are "associated with individuals who are disabled."  53 F.3d at 58-59.  *See also E.E.O.C. v. Wal-Mart Stores, Inc.*, 202 F.3d 281 (Table), 1999 WL 1244485  *2 (10th Cir., Dec. 21, 1999) ("There is no requirement imposed upon a plaintiff alleging a violation of the ADA in this circuit to show replacement by a person outside of the protected class . . . .").

Because the traditional approach for demonstrating that discrimination was a factor in the employment decision is not applied in ADA cases, the Tenth Circuit has indicated alternative approaches.  The *McDonnell Douglas* approach may still be used if the employee has no direct evidence of discrimination and the employer disclaims reliance on the plaintiff's disability for an employment decision.  *Morgan v. Hilti*, *Inc.*, 108 F.3d 1319,

26

1323 n.3 (10th Cir. 1997).  But if the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate. *Id.*

Unfortunately, neither *Morgan* nor the cases on which it relies, explain what level of proof is required for an employer to be found to have "admitted" that the disability played a prominent part in the decision.  Here, plaintiff responds to defendant's argument by claiming that his condition of blindness must have played a prominent part in the defendant's decision to not renew his contract, although defendant would not directly admit as such (Plaintiff's Response at 46-49).

Plaintiff asserts that here defendant in effect admitted that plaintiff's blindness was the cause of his nonrenewal, because the performance failures articulated by defendant all emanated from his blindness.  While the school criticized plaintiff for not keeping students apprised of their grades, this occurred, according to plaintiff, because he was not furnished with computer assisted grade book.  While the school stated that the students complained that plaintiff could not write legibly on the blackboard, and he did not keep up with notices posted in writing on the faculty bulletin board, plaintiff claims he was unable to do so as he was blind and he was not provided with assistance.  Plaintiff asserts that he could not access his e-mail because the school did not provide computer adaptations. In other words, plaintiff claims that the critique of his performance was all based on his being blind–thereby giving rise to an inference that the employer decided not to renew his contract due to his disability.  Plaintiff implicitly suggests that such a showing is

27

tantamount to an employer's "admission" under the test as articulated in *Morgan,* or constitutes direct evidence of discrimination, although plaintiff cites no authority for this suggestion.

All this, however, does not constitute an employer's "admission" by words or conduct as to the employee's disability playing a prominent role in the nonrenewal decision.  Unlike the situation in *Rakity v, Dillon Companies, Inc.*, 302 F.3d 1152, 1165 (10th Cir. 2002), the employer here has not explicitly stated that it made its employment decision due to the employee's conceded disability.

Nor is there other direct evidence to that effect.  In *Butler, supra,* the Tenth Circuit performed what it described as "a close examination of the third prong of the prima facie case" in an ADA claim.  172 F.3d at 748.  The opinion explained that the third prong "requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision," citing *Ennis, supra* (internal quotation marks omitted).  In other words, "the plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, she [the plaintiff] would be entitled to judgment as a matter of law."  *Id.* at 748-49.  As stated in *Butler, supra,* this formulation of the third prong should not be interpreted as diminishing the plaintiff's burden in proving his prima facie case.  While the burden is 'not onerous,' it is also not empty or perfunctory. 72 F.3d at 749, again citing *Ennis.*

Applying this standard to the evidence outlined by plaintiff does not necessarily lead to the conclusion that plaintiff would be entitled to a judgment that the ADA was violated.  After all, the termination of a teacher who cannot write legibly on the blackboard,

who does not apprise students of their grades, and who does not respond to e-mails or to posted notices does not necessarily lead to an inference that disability played a determining role in the decision.  Here, as in *Butler*, *supra*, this is not direct evidence that the performance evaluations were related to his disability, and as in *Butler* there is no evidence that plaintiff's supervisors made any direct comments or remarks about plaintiff's disability.  *Id.* at 749.  Were this the only evidence of record, the Court might agree with the defendant that the third prong of a *prima facie* case of discrimination has not been shown.

However, here, like in *Butler,* there is other evidence that would permit an inference that plaintiff's disability was a determining factor in the employer's decisions regarding him.  As indicated above, there is evidence that the negative evaluations received by plaintiff, and the ultimate nonrenewal of his contract, did relate to his disability.  The mention of possible nonrenewal commenced soon after plaintiff began to request reasonable accommodations for his disability, and the nonrenewal itself appears to have followed within a few days to the situation involving his wife described above.  In *Butler, supra,* the court stated that "[t]he temporal proximity of Plaintiff's request for an accommodation to the decline in his work evaluations and his supervisors' complaints about his work performance contributes to an inference that Plaintiff's position was eliminated because of his disability."  172 F.3d at 749.  Drawing the same inference is possible here and suffices to defeat defendant's claim for summary judgment on plaintiff's claim for wrongful discharge in violation of the ADA.

**E.     Whether Defendant's Legitimate, Nondiscriminatory Reasons Defeat Plaintiff's Claims**

29

Because plaintiff has demonstrated at least a *prima facie* case of unlawful "discharge" in violation of the ADA, the Court must examine whether defendant offers a legitimate, nondiscriminatory reason for nonrenewal.  If so, the burden shifts back to plaintiff to demonstrate that the reasons were pretextual, or otherwise unworthy of belief.

As already summarized above, defendant asserts that plaintiff's contract was not renewed due to problems with plaintiff's performance as a high school teacher.  In its motion, defendant seeks to demonstrate that its issues with plaintiff's teaching abilities were legitimate in that they dated back to plaintiff's first year at the school, as reflected in an evaluation performed by Principal Rick Sullivan and the Theology Department Chairperson, Father James Burshek, as early as December 1999 (Defendant's Motion at 17–18; Exhibit A-9).  The problems were identified again in an evaluation by Sullivan and Burshek in Spring 2000 (Exhibit A-10) and in an observation report by Sister Dunphy, then chairperson of the theology department,  based on a classroom observation of October 11, 2000 (Exhibit A-11).  In addition, defendant cites to and quotes at length from a critical evaluation dated October 24, 2000 (Defendant's Motion at 19-20; Exhibit A-13).  The October 24, 2000 evaluation concludes by stating "the concerns we have are serious and substantial progress must be made in addressing your areas of improvement.  If changes cannot be made, then a real possibility exists that we will not offer you a contract for the 2001-02 school year." (Exhibit A-13 at 3).  In a January 18, 2001 letter to plaintiff, Assistant Principal Resnick reiterated the criticism of his performance and told plaintiff that it was "serious in nature"  She advised that significant changes had to be made in the

30

identified areas in order for him to be issued a contract for the next school year (Exhibit A-4).

Plaintiff responds that the reasons given for his nonrenewal were pretextual. He makes two arguments in this regard.  First he claims that other contemporaneous evaluations of his performance were positive rather than critical of his teaching, citing to different portions of the December 1999 and February 2000 evaluations referred to by defendant (Plaintiff's Response at 50-51).  He thus suggests that defendant's reliance on the negative portions of those evaluations to the exclusion of the positive portions represents an inconsistency in its position.  In *Zuniga v. Boeing Co.*, 2005 WL 1332323 at **4 (10th Cir., June 7, 2005), *cert. denied*, 2006 WL 37119 (Jan. 9, 2006),  the Tenth Circuit pointed out that it "has recognized on numerous occasions that a plaintiff can defeat summary judgment by demonstrating that an evaluation offered to justify his termination conflicts with other assessments of his work performance," citing to several published decisions.

Second, plaintiff points out that the more serious criticism of his work, including the threats that his contract would not be renewed, began in October 2000 as reflected in Exhibit A-13.  Plaintiff asserts that the October evaluation was issued only after his written memorandum of October 24, 2000 (Exhibit 18 to Plaintiff's Response), in which he put in writing his requests for accommodations for his blindness.  According to plaintiff's description, his memorandum was the culmination of a drawn out process of trying to get a computer adapted for use by him. (*See* Plaintiff's Response at 56-57).

Plaintiff asserts that the school's response to his written request for accommodation was Exhibit A-13.  Plaintiff further asserts that Exhibit A-13, despite also being dated October 24, 2000, actually followed his request for accommodations.  Plaintiff asserts that Exhibit A-13 was "back-dated" to October 24, 2000 (Plaintiff's Response at 52), when it was in reality prepared at a later date as indicated by its contents, to make it appear that it preceded plaintiff's request of the same date.

As the cases hold, "[p]retext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Morgan, supra,* 108 F.3d at 1323 (internal quotation marks omitted; emphasis added).  This Court cannot say on the present record that there is an absence of inconsistency or contradiction in defendant's records, or in the facts as portrayed by plaintiff, that would prevent a reasonable factfinder from finding that the defendant's stated reasons for not renewing plaintiff's contract were pretextual.  Conversely, plaintiff has not offered any direct evidence of discrimination based on his disability.  Nonetheless, "plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief."  *Butler, supra,* 172 F.3d at 750.

As has already been noted, the facts appear to show an arguable correspondence of timing between plaintiff's request for accommodations, and an acceleration in the level of criticism of his performance.  Such correspondence by no means proves discrimination, but under the case law it allows for the jury to make an inference of discrimination.  Given

32

some potential inconsistencies and contradictions in the defendant's position, a jury could decide to disbelieve defendant's explanation for plaintiff's termination as a teacher. Accordingly, summary judgment on his claim of wrongful discharge in violation of the ADA must be denied.

**F.    Whether Defendant Failed To Provide Plaintiff With Reasonable Accommodations**

Although not set forth as a separate section of its motion, defendant appears to argue that it is entitled to summary judgment on plaintiff's claim that he requested, but was not provided, reasonable accommodations to assist him in performing his job.  Defendant asserts, essentially, that it provided the reasonable accommodations requested by plaintiff, or at worst there may have been some delay in providing the accommodations (Defendant's Motion at 37-39).  Plaintiff responds by asserting, as supported by his affidavit, the various accommodations he requested were not provided, or if purchased by the school were not installed on his computer, or were otherwise objected to by school administrators (Plaintiff's Response at 56-60).  Suffice it to say that there is a genuine dispute of material as to whether or not the accommodations requested were provided by defendant so as to preclude summary judgment on this claim.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment (Dkt. # 66) is GRANTED, in part, and DENIED, in part.  It is granted to the extent that plaintiff's claim against defendant for fostering a hostile work environment against him as a disabled employee is dismissed, as are any claims relating to plaintiff's asserted

conditions of disability due to phlebitis, diabetes or hearing problems.  As to all of

plaintiff's remaining claims, the motion for summary judgment is denied.

IT IS ORDERED that this matter is set for a scheduling conference on **February

13, 2006 at 11:00 a.m.**, at which time the Court will discuss with counsel how to proceed

on the disputed issues of fact relating to the nature of plaintiff's position as a theology

teacher, for purposes of determining whether the "ministerial exception" applies, including

whether an evidentiary hearing in advance of trial is necessary or desirable.

DATED: January 25, 2006

BY THE COURT:


*s/ Phillip S. Figa*
_____

Phillip S. Figa
United States District Judge